UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGEL GIOGLIO,

                 Petitioner,                 Case No.15-14105

v.                 HON. AVERN COHN

ANTHONY STEWART,

                 Respondent.
_____/

## MEMORANDUM AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

### I. Introduction

This is a habeas case under 28 U.S.C. § 2254. Angel Gioglio, ("Petitioner"), was convicted after a jury trial in state court of uttering and publishing, in violation of M.C.L. § 750.249. She was sentenced as a fourth-time habitual felony offender to 6 to 40 years' imprisonment.

The petition raises two claims: 1) Petitioner was denied her right to present a defense, to confrontation, and to the effective assistance of counsel when the trial court excluded testimony from Petitioner that she received an email from a prosecution witness, and 2) the trial court erred in departing from the recommended sentencing guideline range. For the reasons that follow, the petition will be denied for lack of merit.

### II. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review under 28 U.S.C.

§ 2254(e)(1). See Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant's conviction arises out of a forged check that she presented for deposit. On January 22, 2012, Wendy Arntz went to a mall to walk for exercise. When she arrived, she placed the keys to her car in her sweatshirt and hung the sweatshirt in a coatroom inside the mall. Unbeknownst to Arntz, defendant followed her into the mall, took the keys from inside the sweatshirt, and used the keys to break into Arntz's vehicle. Once inside the vehicle, defendant stole Arntz's purse, which contained, among other items, Arntz's checkbook.
>
> Approximately four days later, defendant agreed to rent several rooms from David Skirvan. Defendant did not immediately give him a security deposit or money for rent, but she assured Skirvan that she would pay him shortly. On February 3, 2012, defendant went to a Chase Bank branch inside of a Meijer store and deposited a check for $1,500 into Skirvan's account. The check was written from Arntz's checking account. Defendant admitted that she deposited the check but testified that Skirvan gave her the check for $1,500 from Arntz's account and asked her to "drop it off for him while he used the bathroom" in the Meijer store. However, Skirvan testified that he did not ask defendant to deposit the check into his account and that he had "nothing" to do with depositing the check at issue. In addition, Arntz and her husband testified that they did not know Skirvan before the initiation of this case and that they never gave anyone permission to write a check from their account to Skirvan. The teller at the bank where defendant deposited the check confirmed that Skirvan was not with defendant at the time the check was deposited, and that defendant did not have Skirvan's account information, so she had to look up his account information to deposit the check.
>
> After defendant moved into his home, Skirvan began to experience issues with his personal belongings and financial affairs. On February 6 or 7, 2012, he attempted to use his debit card to purchase groceries but was told that his account was frozen because of fraudulent activity. On February 8, 2012, he noticed that four checks were missing from his checkbook. He found one of these checks written for $50 to "Angel Gioglio Cleaning Services." When Skirvan confronted defendant, she denied writing the check, and he contacted the Kent County Sheriff's Department on February 8, 2012. That same day, defendant moved out of Skirvan's home at his request. After defendant moved out of Skirvan's home, he learned that his credit card account had been "maxed out" and closed, and his email and Facebook accounts had been closed "due to suspicious activity." Skirvan had let defendant use his laptop computer because she said she needed it for work purposes. Skirvan also testified that shortly after defendant moved into his home, he noticed that several items were

missing from his home, including sterling silver coasters, kitchen utensils, crystal ashtrays, and an expired Michigan identification card, but he initially thought he had simply misplaced these items. In addition, Skirvan testified that after defendant moved out of his home, he went through the area where she had stayed and found Arntz' checkbook hidden in a closet in the upstairs of the home. At trial, defendant denied stealing any items from Skirvan or possessing Arntz's checkbook.

In approximately mid-February 2012, Arntz was walking at the same mall where she had been at the time her purse was stolen. Defendant approached her and inquired if her purse had been stolen from the mall. Arntz confirmed that it had, and defendant stated that she also had her purse stolen from the mall. Defendant told Arntz that the person who stole their purses "ended up being caught" and "went to prison." Arntz testified that she was "suspicious" of defendant at first, but defendant continued to engage her in conversation; defendant told Arntz that she "looked familiar" to her and the women tried to determine how they knew each other. Arntz also testified that defendant inquired whether she had replaced her driver's license. At trial, defendant denied ever speaking to Arntz.

Defendant also testified that she and Skirvan agreed that she would provide cleaning services to Skirvan in exchange for use of a room. However, at trial, the prosecution introduced as an exhibit an email from defendant to a man named Ron Roloff dated February 5, 2012, in which defendant stated that she was renting a room, and "they got paid" for the room. Despite the fact that this email was sent from an email account that defendant admitted was hers, defendant denied "ever hear[ing]" of Roloff. Defendant also testified that Skirvan was "interested in pursuing other things besides room and board," and requested that she be his "companion." When she refused and indicated that she was seeing someone, Skirvan told her that she was "no longer welcome in his home" because she was "dating a different race." Defendant admitted that she had two prior uttering and publishing convictions.

The jury convicted defendant. At sentencing, defendant admitted that she had stolen Arntz' checkbook and committed the charged offense.

People v. Gioglio, No. 317360, 2014 WL 6085697 at *1–2 (Mich. Ct. App. Nov. 13, 2014).

Following her conviction and sentence, Petitioner filed an appeal in the Michigan Court of Appeals. Her appellate brief raised the same claims raised on habeas review.

3

The Michigan Court of Appeals affirmed. Id. Petitioner filed an application for leave to appeal in the Michigan Supreme Court raising the same claims. The application was denied. People v. Gioglio, 862 N.W.2d 206 (Mich. April 28, 2015) (table).

### III. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Relief is bared under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam), quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas

court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) quoting Williams, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.86, 101 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (internal quotation omitted).

"Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time - i.e., the record before the state court." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

IV. Analysis

A. Exclusion of Email

In her first claim, Petitioner contends that the trial court erred in preventing her from testifying about an email she claimed to receive from Skirvan after he told her to leave his house. She argues that the exclusion of this evidence violated her right to present a defense, to confront witnesses, and to the effective assistance of counsel.

Skirvan testified during the prosecution case that after Petitioner left his house he did not have any contact with her. During Petitioner's testimony, defense counsel asked her if she received an email from Skirvan after she left. The prosecutor objected that the email was not authenticated, and defense counsel had not provided him with notice in accordance with the discovery order. The prosecutor stated that he would have had Skirvan testify about the email if he had received notice. Petitioner's counsel argued that the email was relevant to impeach Skirvan's credibility. Defense counsel stated that the email stated "I'll watch you pay for telling me 'no.'" Doc. 8-4, at 56. The trial court sustained the objection on the grounds that defense counsel failed to comply with the discovery order and the prosecutor was prejudiced because he would have addressed the issue during Skirvan's testimony. Id., at 57-58.

The Michigan Court of Appeals denied relief, finding that (1) the trial court did not abuse its discretion in excluding the evidence based on a violation of the discovery order, (2) Petitioner's right to present a defense was not violated because the trial court properly exercised its discretion, (3) Petitioner's confrontation rights were not violated because she had an adequate opportunity to cross examine Skirvan, and (4) Petitioner was not denied the effective assistance of counsel because if the proffered email had been disclosed prior to trial, the prosecutor likely would have used it to discredit Petitioner. Gioglio, 2014 WL 6085697 at *3-5.

2.

With respect to the right to present a defense, although the Sixth Amendment Compulsory Process Clause may be violated by imposing a discovery sanction that entirely excludes the testimony of a material defense witness, See Taylor v. Illinois, 484 U.S. 400, 409 (1988), it does not create an absolute bar to the preclusion of the testimony of a defense witness by the court as a sanction for violating a discovery rule. Id. at 410; Michigan v. Lucas, 500 U.S. 145, 152 (1991) ("We have indicated that probative evidence may, in certain circumstances, be precluded when a criminal defendant fails to comply with a valid discovery rule.").  Although recognizing the constitutional significance of a criminal defendant's ability to present favorable evidence, the Supreme Court in Taylor also emphasized a state's interest in conducting orderly criminal trials and in creating enforceable rules for identifying and presenting evidence. Taylor, 484 U.S. at 410-11.

Although the Supreme Court declined to "draft a comprehensive set of standards to guide the exercise" of a trial court's discretion to sanction a party for failing to comply with discovery rules, the Supreme Court identified several factors that would be relevant in determining whether a discovery sanction would be constitutional. Id. at 414-15.  These factors included a defendant's right to present exculpatory evidence, the integrity of the adversarial system, the interest in administering justice fairly and efficiently, potential prejudice to the truth-seeking role of criminal trials, the reasons for failure to comply with discovery rules, and the relative ease of compliance with the rules. Id. at 414-16.

Here, the Michigan Court of Appeals did not unreasonably apply clearly

established federal law in rejecting Petitioner's claim. The record indicates defense counsel informally showed the email to the prosecutor on a phone prior to trial. However, defense counsel did not comply with the discovery order because counsel did not give notice that it would be presented at trial. Moreover, at the court of appeals explained, Petitioner was able to present her theory of the case without the email:

> The record reveals that defendant had the opportunity to cross-examine Skirvan about facts from which his bias, prejudice, or lack of credibility might be inferred. In addition, there is no indication in the record that trial counsel was unable to question Skirvan about the email in question; rather, it appears trial counsel chose not to pursue this line of questioning during cross-examination of Skirvan. Therefore, exclusion of this evidence did not deny defendant her constitutional right to confront Skirvan.

People v. Gioglio, No. 317360, 2014 WL 6085697, at *4.

This conclusion is reasonable. With the quantum of evidence on the defense theory in the record, this Court concludes that the petitioner was afforded "a meaningful opportunity to present a complete defense." Allen v. Howes, 599 F. Supp. 2d 857, 873 (E.D. Mich. 2009). Petitioner is therefore not entitled to relief on the grounds she was denied a right to present a defense.

3.

With respect to Petitioner's claim that the trial court's order violated her right to confront witnesses, "the Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defendant might wish.'" United States v. Owens, 484 U.S. 554, 559 (1988)(internal quotations omitted). Here, Petitioner was given a full and fair opportunity to cross examine Skirvan. Defense counsel did not attempt to question Skirvan about the alleged email during cross examination, and thus, there is no basis

on which to conclude that Petitioner was prevented from confronting him about the email.

4.

Finally, Petitioner argues says that defense counsel was ineffective for failing to comply with the discovery order and then using the email in her defense. To demonstrate that she was denied the effective assistance of counsel, Petitioner must demonstrate that counsel's performance was deficient, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." 466 U.S. at 689.

The Michigan Court of Appeals did not unreasonably apply this standard. Rather, it carefully applied the principles of Strickland and concluded that Petitioner was not entitled to relief, explaining:

> The record establishes that if defendant had identified the email as an exhibit before trial, the prosecution would have questioned Skirvan about the email during his direct examination, and Skirvan would have likely testified that defendant stole his email passwords and that she sent the email to herself from his email account. Moreover, at trial the prosecution admitted evidence to establish that defendant lied about at least one other email. In other words, if defendant had identified the email as an exhibit before trial, the prosecution could have used the email to discredit defendant. Therefore, the record supports a finding that trial counsel's initial decision not to utilize the email as an exhibit was a matter of trial strategy, Horn, 279 Mich.App at 39. The fact that this strategy did not work does not render counsel's performance objectively unreasonable. Petri, 279 Mich.App at 412. In addition, defendant's trial counsel used several lines of questioning in an attempt to impeach Skirvan and attack Skirvan's credibility at trial. Trial counsel's decisions regarding how to attack the credibility of Skirvan (including whether to identify the email as an exhibit before trial) were a matter of trial strategy, and the record does not establish that defense counsel's performance in this regard was so deficient that it fell below

9

an objective standard of reasonableness.

People v. Gioglio, No. 317360, 2014 WL 6085697, at *4 (Mich. Ct. App. Nov. 13, 2014), appeal denied, 497 Mich. 1015, 862 N.W.2d 206 (2015)

The court of appeals analysis and conclusion is reasonable. The evidence indicating Petitioner's guilt was overwhelming. She was not only identified by Skirvin, but also by a bank teller, and by Mr. and Mrs. Arntz as the person who deposited the check stolen from the Arntz family. Presentation of the email would not have, with reasonable probability, produced a more favorable outcome for Petitioner. Indeed, as the Michigan Court of Appeals noted, the prosecutor could have used it to show that Petitioner stole Skirvan's email password.

Overall, Petitioner is not entitled to relief on her first claim.

### B. Sentencing Claim

In her second claim, Petitioner says that the trial court incorrectly scored the guidelines and improperly departed upward. The trial scored Petitioner's minimum sentence guidelines at 10 to 46 months and departed upward from the guidelines by sentencing defendant to a minimum of six years (72 months). The trial court gave two reasons for its departure: (1) defendant was a "pathological liar" who "had a story for everything;" and (2) defendant engaged in predatory conduct, both before and after the uttering and publishing offense, because she "scope[d]" out Arntz before the offense and because she went to the mall and spoke with Arntz after the offense, talking with her about the theft of her purse and claiming that the perpetrator had been apprehended. The trial court explained that these factors were objective and verifiable and that they were not adequately considered under the guidelines.

See People v. Gioglio, No. 317360, 2014 WL 6085697, at *5. Petitioner is not entitled to habeas relief on this claim.

First, questions about the scoring of the guidelines themselves are not cognizable because they raise issues state law. See Tironi v. Birkett, 252 F. App'x 724, 725 (6th Cir.2007); Howard v. White, 76 F. App'x 52, 53 (6th Cir.2 003). "Petitioner has no state-created interest in having the Michigan Sentencing Guidelines applied rigidly in determining his sentence." See Mitchell v. Vasbinder, 644 F. Supp. 2d 846, 867 (E.D. Mich. 2009) (citing Shanks v. Wolfenbarger, 387 F. Supp. 2d 740, 752 (E.D. Mich. 2005). Thus, any error by the trial court in calculating her guideline score or in departing above her sentencing guidelines range alone would not merit habeas relief. .

Petitioner, however, contends that the trial court violated her Sixth Amendment right to a trial by jury by using factors that had not been submitted to a jury and proven beyond a reasonable doubt or admitted to by petitioner when scoring the Michigan Sentencing Guidelines. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court held that other than the fact of a defendant's prior conviction, any fact that increases or enhances a penalty for a crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. Id., at 301 (citing Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

The holding in Blakely does not apply to Petitioner's sentence. Indeterminate sentencing schemes such as Michigan's scheme, unlike determinate sentencing schemes, do not infringe on the province of the jury. Blakely, 542 U.S. at 304-05, 308-09. Moreover, Apprendi and Blakely do not apply to a judge's factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory

maximum, which Petitioner's sentence did not. See Chontos v. Berghuis, 585 F.3d 1000, 1002 (6th Cir. 2009); Montes v. Trombley, 599 F.3d 490, 495 (6th Cir. 2010).

The Court is aware that in Alleyne v. United States, ––– U.S. –––, –––, 133 S.Ct. 2151, 2155 (2013), the Supreme Court extended the holdings in Apprendi and Blakely and held that any fact that increases a mandatory minimum sentence for a crime is an element of the criminal offense that must be proven beyond a reasonable doubt. The Supreme Court also made clear that its decision did not mean that every fact influencing judicial discretion in sentencing must be proven to a jury beyond a reasonable doubt. Id. at 2163. Moreover, "Alleyne dealt with judge-found facts that raised the mandatory minimum sentence under a statute, not judge-found facts that trigger an increased guidelines range," the latter of which occurred in Petitioner's case. Unlike the laws at issue in Alleyne and Apprendi, the Michigan Sentencing Guidelines do not require a trial court to impose a higher sentence nor do they allow him or her to impose a more severe sentence that was necessarily unavailable before. Id. Because the Michigan Sentencing Guidelines merely advise a sentencing judge in Michigan how to exercise his or her sentencing discretion, Alleyne does not afford Petitioner relief.

Finally, the Michigan Supreme Court's recent decision in People v. Lockridge, 498 Mich. 358 (Mich. July 29, 2015), holding that Michigan's sentencing guideline scheme violates the Sixth Amendment under Alleyne, does not provide a basis for habeas relief. First, a decision of the Michigan Supreme Court does not constitute clearly established United States Supreme Court law. Second, the Michigan Supreme Court made its holding in Lockridge applicable only to cases still "pending on direct review." Id. at 25-26. Petitioner's case was not pending on direct review when

12

Lockridge was decided. Thus, she does not benefit from its holding.

V. Conclusion

The state court's decision denying Petitioner relief is neither unreasonable nor contrary to Supreme Court precedent. Accordingly, the petition is DENIED. Furthermore, reasonable jurists would not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. The Court therefore DECLINES to grant a certificate of appealability under 28 U.S.C. § 2253(c)(2).[1]

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: November 23, 2016
         Detroit, Michigan

---

[1] "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.